UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
JAMES J. VENERUSO, as Temporary Receiver for    :
Community Choice Health Plan of Westchester, Inc.,
                                                   :

                  *Plaintiff*,
                                                   :

    v.
                                                     :

MOUNT VERNON NEIGHBORHOOD
HEALTH CENTER,                                       :

                  *Defendant*.                             :
----------------------------------------------------------------x

DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION TO REMAND

James L. Feldesman
Matthew S. Freedus
Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W., 2d Floor
Washington, DC 20036
Tel.:   (202) 466-8960
Fax:   (202) 293-8103
Email: jfeldesman@feldesmantucker.com
Email:  mfreedus@feldesmantucker.com


MENZ BONNER & KOMAR LLP
David A. Koenigsberg
444 Madison Avenue, 39th Floor
New York, New York   10022
Tel.: (212) 223-2100
Email:  dkoenigsberg@mbklawyers.com

*Attorneys for Defendant*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

THE MEDICAID PROGRAM AND FEDERALLY-QUALIFIED
HEALTH CENTERS (FQHCs) ...................................................................................... 1

The Complaint on its Face .............................................................................................. 7

Artful Pleading ............................................................................................................... 10

Material Omissions and Misrepresentations ................................................................. 10

ARGUMENT ................................................................................................................... 20

CONCLUSION  ............................................................................................................... 29

# TABLE OF AUTHORITIES

Cases:

*Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985) ................................................. 10

*Andersen ex rel. Andersen, Weinroth & Co., L.P. v. Weinroth*, 48 A.D.3d 121,

    849 N.Y.S.2d 210 (N.Y. App. Div. 1 Dept. 2007) ............................................. 23

*Benitez-Bithorn v. Rosello-Gonzalez*, 200 F.Supp.2d 26 (D.P.R.2002) ..................... 27

*Bobo v. Christus Health,* 359 F.Supp.2d 552 (E.D. Tex. 2005) ................................. 22

*Colorado v. Symes,* 286 U.S. 510 (1932) .................................................................. 26

*County of St. Charles, Mo. V. Missouri Family Health Council,* 107 F.2.3d 682

    (8th Cir. 1997) ...................................................................................................... 25

*Cupo v. Community Nat. Bank & Trust Co. of New York*, 438 F.2d 108 (2d Cir. 1971) ........25, 26

*Downey v. State Farm Fire & Casualty Co.,* 266 F.3d 675 (7th Cir. 2001).............................. 24

*Faulk v. Owens-Corning Fiberglass Corp.*, 48 F.Supp.2d 653, 669 (E.D.Tex. 1999) ............... 27

*Franchise Tax Bd. v. Construction*

    *Laborers Vacation Trust*, 463 U.S. 1 (1983)............................................... 10, 16, 20, 21, 23

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.,* 545 U.S. 308 (2005)............20, 22, 24

*Henry v. First Nat'l Bank of Clarksdale,* 595 F.2d 291 (5th Cir. 1979) .................................... 25

*In re Joliet-Will County Community Action Agency*, 847 F.2d 430 (7th Cir. 1988).........25, 26, 27

*Isaacson v. Dow Chem. Co.,* 517 F.3d 129 (2d Cir. 2008)......................................................... 26

*Joseph Marino v. Three Lower Counties, Community Services, Inc.,*

    Case 1:09-cv-03027-JFM (D. Mid. N. Div.)....................................................... 18

*Lippitt v. Raymond James Financial Services, Inc*., 340 F.3d 1033 (9th Cir. 2003) ................... 10

*Maricopa County v. Valley National Bank,* 318 U.S. 357 (1943) ............................................... 24

*Menthe v. Wenzel,* 178 A.D.2d 705 (N.Y.S. 3d Dept. 1991)...................................................... 23

*Murphy v. Colonial Federal Savings & Loan Ass'n*, 388 F.2d 609 (1967)................................. 25

*Neukirchen v. Wood County Head Start, Inc.*, 53 F.3d 809 (7th Cir. 1995).............. 18, 19, 25, 26

*Olguin v. Inspiration Cons. Copper Co*., 740 F.2d 1468 (9th Cir. 1984)................................... 10

*Palmiter v. Action, Inc.*, 733 F.2d 1244 (7th Cir. 1984)........................................................25, 26

*Paramount Film Distrib. Corp. v. State of New York,* 30 N.Y.2d 415, 334 N.Y.S.2d 388, 285

    N.E.2d 695 (1972) ................................................................................................. 23

*People ex rel. Spitzer v. Grasso*, 11 N.Y.3d 64, 893 N.E.2d 105 (Ct. App. 2008)..................... 18

*PNC Bank, N.A. v. PPL Elec. Utilities Corp.,* 189 Fed. Appx. 101 (3d Cir. 2006).................... 22

*Richardson Greenshields Sec., Inc. v. Lau,* 819 F.Supp. 1246 (S.D.N.Y. 1993) ........................ 24

*Shulthis v. McDougal,* 225 U.S. 561 (1912) .............................................................................. 20

*Smith v. Kansas City Title & Trust Co.,* 255 U.S. 180 (1921).................................................... 20

*United States v. Alabama,* 313 U.S. 274 (1941) ........................................................................ 24

*Wong v. Community Health Center La Clinica,* 2007 WL 1246231 (E.D. Wash 2007) ........28, 29

**Statutes:**

18 U.S.C. § 6 .................................................................................................................... 26

26 U.S.C. § 501(c)(3) ................................................................................................1, 13, 22

28 U.S.C. § 451 ................................................................................................................ 26

42 U.S.C. § 233(g) ........................................................................................................... 27

42 U.S.C. §254a ............................................................................................................... 26

42 U.S.C. § 254b ........................................................................................................... 1, 2

42 U.S.C. § 254b(a)(1) ...................................................................................................... 2

42 U.S.C. § 254b(a)(1)(A) ................................................................................................. 2

42 U.S.C. § 254b(a)(2) ...................................................................................................... 2

42 U.S.C. § 254b(e)(5)(A) ...........................................................................................18, 27

42 U.S.C. § 254b(e)(5)(D) ........................................................................................5, 18, 27

42 U.S.C. § 254b(j)(3)(A) .................................................................................................. 2

42 U.S.C. § 254b(j)(3)(E) .................................................................................................. 2

42 U.S.C. § 254b(j)(3)(G)(i) .............................................................................................. 2

42 U.S.C. § 1320a-7b(b) .................................................................................................... 1

42 U.S.C. § 1320a-7b(b)(3)(H) .....................................................................................14, 22

42 U.S.C. §§ 1395k(a)(2)(D)(ii) ........................................................................................ 3

42 U.S.C. § 1396a(a)(1)-(65) ............................................................................................. 2

42 U.S.C. § 1396a(a)(10)(A) ............................................................................................. 3

42 U.S.C. § 1396a ........................................................................................................2, 27

42 U.S.C. §§ 1396a(bb)(2) ................................................................................................ 3

42 U.S.C. § 1396b(m).................................................................................................19, 27

42 U.S.C. § 1396b(m)(1)(A).......................................................................................4

42 U.S.C. § 1396b(m)(1)(C)(ii) ................................................................................4

42 U.S.C. § 1396b(m)(1)(C)(ii)(IV)...........................................................1, 9, 13, 19

42 U.S.C. § 1396b(m)(2)(A)(iii) ...............................................................................8

42 U.S.C. § 1396b(m)(2)(G)....................................................................................19, 28

42 U.S.C. § 1396d(1)(2)(B) ......................................................................................2

42 U.S.C. §1296d(1)(2) ............................................................................................2

Omnibus Budget Reconciliation Act, Pub. L. No. 101-239 ....................................2

N.Y. Pub. Health L. §4403-a ...............................................................................7, 8

**Other Authorities**

42 C.F.R. § 51c.101-51c.507 ...................................................................................27

42 C.F.R. § 51c.102(e) ..............................................................................................2

42 C.F.R. §430 .........................................................................................................2

42 C.F.R. §430.15(a) ................................................................................................2

42  C.F.R. §430.15(b) ...............................................................................................2

42 C.F.R. § 438 .........................................................................................................8

42 C.F.R. § 438.806...................................................................................................8

42 C.F.R. § 74.24 ......................................................................................................27

42 C.F.R. § 74.38 ......................................................................................................27

45 C.F.R. 74.37 .........................................................................................................26

Treas. Reg. 1.501(c) (3) ...........................................................................................12, 22

H.R. Rep. No. 101-247 U.S.C.C.A.N. 2118-19.......................................................3

S. Rep. No. 104-186, 2002 U.S.C.C.A.N. 4129 .................................................................. 5

S. Rep. No. 107-83, 2002 U.S.C.C.A.N 1003 ................................................................... 5

53 Fed. Reg. 744-01 ..................................................................................... 5, 9, 13

70 Fed. Reg. 38081-01 ................................................................... 14, 15, 22, 28

N.Y. General Counsel Opinion 4-24-2002 ................................................... 27

## INTRODUCTION

Despite plaintiff's artful pleading, a close inspection of the complaint reveals that each of plaintiff's claims, although framed as state-law claims only (declaratory relief, unjust enrichment, and money had and received), hinge on the assertion that the payments at issue were categorically "unlawful," "unjust," "*ultra vires*," and "inequitable," and that Mount Vernon had "no legal or equitable" right to them. Compl. 8-10. The complaint seeks a full declaration as to "the parties' rights" and a determination as to the lawfulness of the payments. The lawfulness of the payments and Mount Vernon's right to have received and spent the funds are derived from and governed by federal statutes and regulations. *E.g.*, 42 U.S.C. §§ 254b, 1320a-7b(b), 1396b(m)(2)(G), 1396b(m)(1)(C)(ii)(IV), 26 U.S.C. § 501(c)(3). Thus, substantial and disputed federal questions are necessary (and outcome determinative) elements of plaintiff's own claims, not merely a defense to them. To the extent that the substantial federal questions are not apparent on the face of the complaint, it is the result of plaintiff's failure to plead necessary federal issues and other material omissions and misrepresentations.

## THE MEDICAID PROGRAM AND
## FEDERALLY-QUALIFIED HEALTH CENTERS (FQHCs)

A brief overview of the Medicaid program and the role of Section 330 "federally-qualified health centers" will bring the substance of the complaint into proper focus.

The Medicaid program was established in 1965. Activities under the program are carried out by States. A State's Medicaid program, by engaging the services of hospitals, clinics, physicians, *etc.*, makes health care available to the program beneficiaries. Participation in the Medicaid program by any State is voluntary. However, once such an election is made, the State must comply with all federal requirements.

Any State that has elected to participate must submit, for prior federal approval, a State Medicaid plan. The plan contains provisions regarding eligibility conditions, medical care and services, payment, and compliance with program requirements. *See, generally*, 42 U.S.C. § 1396a(a)(1)-(65) and 42 C.F.R. § 430 *et seq*. The Secretary of the U.S. Department of Health and Human Services ("HHS") reviews each plan to assure that it complies with federal statutory and regulatory requirements. 42 U.S.C. § 1396a; 42 C.F.R. § 430.15(a). The Secretary has delegated the power to review and approve plans to Regional Administrators of the Centers for Medicare and Medicaid Services ("CMS"), *id*. § 430.15(b), which is the division of HHS responsible for the Medicaid program.[1]

In 1989, Congress created a new kind of entity labeled a "Federally-qualified health center" or "FQHC." Omnibus Budget Reconciliation Act, Pub. L. No. 101-239. FQHCs as defined in federal Medicaid law at 42 U.S.C. § 1396d(l)(2), are principally recipients of grants under Section 330 of the Public Health Service Act, 42 U.S.C. § 254b.  Mount Vernon is such an FQHC. Section 330 grantees, with minor exception, are tax-exempt entities under 26 U.S.C. § 501(c)(3), which receive a direct grant from the United States under Section 330.  That grant and other sources of revenue allow those grantees to provide primary and other health care services to communities that HHS has deemed to be "medically underserved."[2]  42 U.S.C. §§ 254b and 1396d(1)(2)(B); 42 C.F.R. § 51c.102(e).

---

[1] CMS was previously named the Health Care Financing Administration ("HCFA").

[2] Health centers eligible to receive Section 330 grant funds must have been determined by appropriate HHS officials to, among other things: (1) be located in a medically underserved area or serving a medically underserved population (42 U.S.C. § 254b(a)(1)); (2) provide an especially comprehensive range of primary health services to its patients through staffs of physicians and other health care providers (rarely, if ever, available from an ordinary physician's group) (42 U.S.C. § 254b(a)(1)(A) and 254b(j)(3)(A)); (3) provide health care services to Medicaid recipients (42 U.S.C. § 254b(j)(3)(E); and (4) serve all residents of their communities, regardless of any resident's/patient's ability to pay. 42 U.S.C. § 254b(a)(1) and 254b(j)(3)(G)(i).

2

"Federally-qualified health center services . . . and any other ambulatory services offered by a federally qualified health center" are among the "mandatory" Medicaid services to which all Medicaid beneficiaries are entitled. 42 U.S.C. §§ 1396d(a)(2)(C), 1396a(a)(10)(A), and 1396d(l)(2)(A).  A State Medicaid plan must pay for covered services provided by FQHCs. Thus, in addition to receiving direct grants, FQHCs are also entitled to be reimbursed for providing Medicare or Medicaid services. 42 U.S.C. §§ 1395k(a)(2)(D)(ii) and 1396a(bb)(2). Congress enacted special payment provisions ensuring that FQHCs would be reimbursed for 100% of their reasonable cost associated with furnishing those services. The purpose in doing so was in part to "ensure that Federal PHS Act grant funds are not used to subsidize health center or program services to Medicaid beneficiaries." H.R. Rep. No. 101-247, at 392-93, *reprinted in* 1989 U.S.C.C.A.N. 2118-19.

Most importantly for this case, FQHCs are afforded special treatment under the provisions of federal Medicaid law governing States, such as New York, that use "managed care" (as opposed to direct fee-for-services) to implement their Medicaid programs.  In Medicaid managed care, the State's agency in charge of Medicaid contracts with managed care entities, which, in turn, arrange for the delivery of health care services to Medicaid patients by contracting with health professionals and various entities such as hospitals and laboratories.[3] Under § 1396b(m), a Medicaid managed care entity is paid a fixed monthly sum ("capitation") for each Medicaid beneficiary assigned to the entity (an "enrollee"). With that fixed sum or capitation, the entity is responsible for providing covered (by Medicaid) care to each such enrollee. In short, the entity

---

[3] These entities also may be those that employ the individual physicians and others who assist beneficiaries regarding those beneficiaries' medical needs and own the hospitals, etc., that provide the care. Those entities still exist but today are few and far between. They were very popular and far more numerous when the Medicaid statute, in 1976, first specifically authorized managed care through 42 U.S.C. § 1396b(m), the same section (but with many changes) that currently regulate the types of entities States may engage for managed care.

assumes the "insurance" risk that its premiums, or, in Medicaid, its capitations, may produce less revenue than its costs for paying and managing its insureds' claims.

Section 1396b(m)(1) and (2) details the requirements that an entity must meet in order to receive such a contract. Among those requirements is the condition that contracting entities must either satisfy § 1396b(m)(1)'s definition of a Medicaid managed care organization ("MCO") or be among certain types of entities described under § 1396b(m)(2).  In 1997, § 1396b(m)(1) and (2) were amended so as to define FQHCs as MCOs.  42 U.S.C. § 1396b(m)(1)(A) and (C)(ii). Before then (in fact since 1976 when § 1396b(m) was enacted) health centers, under predecessor provisions to the current Section 330 (and its codification specifically at 42 U.S.C. § 754b), were made eligible to receive those contracts under § 1396b(m)(2)(B) and (G).

Sections 1396b(m)(2)(B) and (G) not only made the centers eligible for the contracts but also exempted them from §1396b(m)(2)(A) requirements applicable to other managed care contractors, including the requirement that a contracting entity must meet the definition of an MCO.

The 1997 amendment regarding the centers' (or group of centers' or separate entity's (owned or controlled by a center or centers)) eligibility to be managed care contractors as MCOs notably retained the (m)(2)(B) and (G) eligibility provisions.  There are accordingly, three independent bases for a Section 330 grantee (based on certain factors) to be, or to own and contract with, an entity that is authorized by federal Medicaid law to be a managed care contractor.

The purpose behind these provisions is plainly to facilitate center participation in Medicaid managed care and to enhance a center's ability to provide quality services to its patient pool. They maximize the federal government's return in its investment because Section 330 centers are

required by law to use any revenue derived from this participation in managed care to "benefit the objectives of the [Section 330] project." 42 U.S.C. § 254b(e)(5)(D).[4]

One of these provisions (§ 1396b(m)(2)(G)) is directly applicable here. In 1996, it provided that "an entity which is receiving (and has received during the previous two years) a grant of at least $100,000 under section 329(d)(1)(A) or 330(d)(1) of the [PHS] Act," is eligible to receive a Medicaid managed care contract. That is the provision that was specifically utilized by HHS to approve the Medicaid managed care contract that plaintiff (which is not an FQHC or eligible for such a contract in its own right) received in 1996. *See* letter of November 7, 1996 from Associate Regional Administrator, HCFA, annexed hereto as Exhibit 1. Even though that provision is limited to what is now Section 330 grantees, HHS stretched that provision to allow a Section 330 grantee to join forces with other entities, including those that were not such grantees (*e.g.*, a nonprofit hospital), to establish another entity to receive a Medicaid managed care contract. HHS' stretch of its authority was limited by two conditions: (1) the entity had to be primarily owned and controlled by one or more Section 30 grantees; and (2) the entity's enrollees had to receive medical services primarily from those grantees. *See*, *e.g.*, Proposed Rule Change, Health Care Financing Administration ("HCFA"), HHS, 53 Fed. Reg. 744-01, 1988 WL 274000 (F.R.) (Jan. 12, 1988) (recognizing that, where health centers formed entities as a "corporate vehicle" to combine forces with non-exempt providers, such as hospitals, to receive a Medicaid managed care contract, "it would be consistent with Congressional intent to recognize the continuing force of the exemption if the exempt centers control the HMO and if substantially all the

---

[4] Congress has repeatedly recognized FQHCs as "high-quality providers with a unique capability to provide enabling services to underserved populations and [are] often the sole providers of health care services in geographically isolated or economically depressed areas." S. Rep. No. 104-186, at 6-7 (1995), *reprinted in* 1996 U.S.C.C.A.N. 4129, 4134-35. *See also* S. Rep. No. 107-83, at 7 (2001), *reprinted in* 2002 U.S.C.C.A.N. 1033, 1038 (studies show that FQHCs provide care of equal or greater quality, at significantly less cost, than HMOs, hospital outpatient units, or private physicians).

primary care services are provided through the exempt centers"). As explained below, that is precisely what happened here.

Moreover, in 1997, Congress explicitly protected this very arrangement. While preserving § 1396b(m)(2)(G), it added § 1396b(m)(1)(C)(ii)(IV), which provides that "one or more Federally qualified health centers"[5] may receive a Medicaid managed care contract or "control" a Medicaid managed care organization – *i.e.*, "direct or cause the direction of the management and policies of the organization through membership, board representation, or an ownership interest equal to or greater than 50.1 percent."

Against this backdrop, it is clear that Congress has authorized Section 330 grantees, like Mount Vernon, to receive capitation payments either directly or indirectly through a "corporate vehicle" like CCHP.  CCHP indisputably was established to, and has engaged in, only one activity – being a Medicaid managed care contractor owned and controlled by defendant herein, and subject to the conditions imposed by HHS in authorizing § 1396b(m)(2)(G) to be used by the State to contract with CCHP.  The complaint describes actions by CCHP taken in the course of being such a contractor and acting consistently with the conditions HHS imposed to allow defendant to use its special federal authority to become a managed care contributor to establish and maintain CCHP.  All such actions were products of federal law specifically designed to benefit Section 330 health centers.

The Court need not take defendant's word for this assertion.  CCHP's contract with the State was submitted to the New York regional office of their HCFA, now CMS, for approval. The approval included, and focused on, the use of defendant's managed care contractor eligibility under § 1396b(m)(2)(G) as the State's basis for its authority under federal law to contract with CCHP.  The regional office's letter of approval to the State (attached as Ex. 1) acknowl-

---

[5] By this time, the FQHC provisions of the Medicaid statutes had been enacted.

edges the use of § 1396b(m)(2)(G) authority and specifies conditions of CCHP's operations, specifically including defendant's control of CCHP. The reality that federal Medicaid law pervades the entire operation of CCHP and that Mount Vernon's control of CCHP is a specific requirement imposed by the federal government on the State of New York – and, by the way, fully accepted by the State – cannot be escaped through obfuscation or artful pleading.

<strong>The Complaint on its Face</strong>

Although avoiding mention of federal law like the plague, the complaint's allegations nonetheless reveal the following on that score:

CCHP is a not-for-profit corporation which "provided comprehensive health services on a pre-paid and capitated basis to an enrolled population composed almost entirely of Medicaid recipients. . ." Compl. 1-2  ¶¶ 2, 4. CCHP was certified under Article 44 of New York Public Health Law to operate as a prepaid health services plan. *Id*. at p. 2, ¶ 4. Article 44 states, in part, that an "entity," like CCHP, may obtain a special certificate of authority to operate as a pre-paid health services plan and "offer a comprehensive health services plan on a *prepaid contractual* basis . . . to an enrolled population, which is substantially composed of persons eligible to receive benefits under title XIX of the *federal social security act . . .*" N.Y. Pub. Health L. § 4403-a(1) (emphasis added).  "[T]itle XIX of the federal social security act" is the authorization of the Medicaid program and codified at 42 U.S.C. § 1396 *et seq*. There is no question that § 4403-a(1) is referring to a Medicaid managed care contract governed by 42 U.S.C. § 1396b(m).

Article 44 further states that these Medicaid managed care contracts are contingent on "federal financial participation." N.Y. Pub. Health L. § 4403-a(5). A "certificate of authority shall be issued to an approved provider of comprehensive health services . . . provided that *federal financial participation* is available for expenditures made on behalf of recipients of medical

7

assistance." N.Y. Pub. Health L. § 4403-a(5) (emphasis added). Federal financial participation (FFP) is a term of art in Medicaid managed care. 42 C.F.R. § 438 (FFP is only available if Medicaid managed care contract recipient complies with the provisions of 45 C.F.R. Part 438 (incorporating, at 42 C.F.R. § 430.2, the provisions of 42 C.F.R. Part 74); 42 C.F.R. § 438.806 (FFP is not available for expenditures under a managed care contract unless the Medicaid State agency secures prior written approval from the regional CMS office, indicating that contractor meets the definition of an MCO "or is one of the entities described in paragraphs (b)(2) through (b)(5) of § 438.6) (referring among others, to "Community . . . Health Centers, identified in section 1903(m)[§ 1396b(m)](2)(G) [and] (2)(B) . . ."). *See also* 42 U.S.C. § 1396b(m)(2)(A)(iii) (payment of federal funds for Medicaid managed care contingent on prior federal approval).

Article 44 further states that "an entity or a group of entities seeking to provide comprehensive health services pursuant to the provisions of this section [§ 4403-a] may apply for a special purpose certificate of authority." N.Y. Pub. Health L. § 4403-a(2). Here, as the complaint alleges, Mount Vernon and Sound Shore (both New York not-for-profit and 501(c)(3) tax exempt organizations) entered into a Joint Venture Agreement ("JVA") for the purpose of establishing and operating CCHP as a pre-paid health services plan. Compl. 2-3 ¶ 4, 8.

The complaint states that Mount Vernon and Sound Shore collectively "controlled" CCHP, but that Mount Vernon was really the one that "controlled the activities, operations and affairs of CCHP" because its ownership interest in CCHP was more than 50 percent. Compl. 4 ¶ 10. This allegation in the complaint – and N.Y. Pub. Health L. § 4403-a(2), which is referenced therein – is a reflection of the Medicaid statute's managed care provisions that specifically authorize Section 330 grantees, like Mount Vernon, to receive and carry out managed care contracts and, if they wish, to do so in conjunction with other providers through a separate entity,

8

like CCHP, but only if the grantee or group thereof controls that separate entity. *See, e.g.*, 53 Fed. Reg. 744-01, 1988 WL 274000 (HHS stating that, where FQHCs form entities as a "corporate vehicle" to combine forces with non-exempt providers, like nonprofit hospitals, to receive a Medicaid managed care contract, "it would be consistent with Congressional intent to recognize the continuing force of the exemption if the exempt centers control the HMO and if substantially all the primary care services are provided through the exempt centers"). In other words, the JVA between Mount Vernon and Sound Shore – which the complaint cites (Compl. 3 ¶ 8) but does not attach – is precisely the type of arrangement that allowed HHS to authorize health centers, like Mount Vernon, to make to use and benefit from its spread of § 1396b(m)(2)(G) authority.

The complaint further reveals that CCHP is a "provider sponsored" managed care organization under § 1396b(m)(2)(G). *See also* § 1396b(m)(1)(C)(ii)(IV). That is, the complaint states that "Mount Vernon and Sound Shore have referred to themselves as CCHP's '*sponsors*'" who were both "significant *providers* of health services to enrollees of CCHP." Compl. 3 ¶ 7, 9 (emphases added). Once again, these allegations describe, albeit without citation, one of the conditions of obtaining federal approval for a Section 330 grantee to use its § 1396b(m)(2)(G) authority.

In other words, the complaint itself reveals, among other things: (a) CCHP is a not-for-profit corporation with § 501(c)(3) tax exempt status and was a Medicaid managed care contractor; (b) the managed care contract it received required prior federal approval; (c) federal funds for managed care are contingent on such prior approval and compliance with federal law; (d) the "prepaid" capitation CCHP received under the contract consisted of Medicaid funds; (e) the payments CCHP made to Mount Vernon came from its "surplus" capitation; and (f) the provision of

9

federal law under which CCHP received its contract provides a right or eligibility for a contract to Mount Vernon (not CCHP).

### Artful Pleading

To the extent that the substantial and disputed federal issues are not readily apparent on the face of the complaint, the sole cause is the artful pleading, resulting in material omissions and misrepresentations. Under the artful pleading doctrine, "a plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint." *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 22 (1983). This doctrine provides an exception to the rule that a court is limited to what appears on the face of a "well-pleaded" complaint in deciding whether removal is proper. The artful pleading doctrine permits a court to look beyond the complaint to assess its true character when it appears that the plaintiff is trying to conceal the nature of the case. "[I]n determining whether a complaint is 'artfully pleaded', the court is not bound to consider only the facts pleaded in the complaint but may look elsewhere to ascertain facts that would appear in a 'well pleaded' complaint." *Olguin v. Inspiration Cons. Copper Co.*, 740 F.2d 1468, 1473 (9th Cir. 1984), overruled on other grounds, *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985); *Lippitt v. Raymond James Financial Services, Inc.*, 340 F.3d 1033, 1039-40 (9th Cir. 2003) (same).

### *Material Omissions and Misrepresentations*

1.      Not only does the complaint fail to cite the federal law on which the relationship between the parties and the payments at issue are premised, but it misrepresents the substance of that relationship. In particular, plaintiff states that CCHP never became "a party to the Joint Venture Agreement" between Mount Vernon and Sound Shore. Compl. 3 ¶ 8. That assertion is not just wrong but misleads on the critical issue in the case – the lawfulness of the distributions. The

JVA expressly contemplates that any surplus distribution other than the return of capital invest-
ments would be "in the form of grants" to Mount Vernon and Sound Shore. *See* JVA p.15 (sur-
plus distributions "shall be distributed to [Mount Vernon and Sound Shore] in the form of grants.
. .") available at http://www.cchpcourtdocuments.org/CourtDocuments/Document1/VP-
Exhibit06.pdf (last visited Jan. 27, 2010). Plaintiff neglects to mention that detail.

Moreover, nearly two months before the complaint was filed, Mount Vernon advised
plaintiff that CCHP, at its first board meeting on March 29, 1994, unanimously passed a resolu-
tion to adopt the JVA as one of its governing documents. Its decision to do so was based on the
advice of counsel and the understanding that the JVA would be controlling on its operations and
actions with respect to surplus distributions. These facts are evidenced in CCHP's Board meeting
minutes and other documents that Mount Vernon provided to plaintiff several weeks prior to this
action. *See* August 5, 2009 letter from M. Freedus annexed hereto as Exhibit ("Ex.") 2 at Enclo-
sures ("Encls.") 3-5.

2.      Plaintiff alleges that New York State has taken the position that the payments at
issue violated N-PCL § 515(a), Compl. 7 ¶ 21, but neglects to mention that both the state and
federal governments knew and approved of the JVA and plaintiff's intent to make the very pay-
ments at issue.  Plaintiff's representation of the State's position suggests that the State's Medi-
caid agency has pledged to follow a requirement imposed under preemptive federal law that vio-
lates State law.  If the agency did so, the State is nonetheless bound.  Considering that the con-
tract to CCHP, and CCHP's status under State law enabling it to receive the contract, relied on a
provision of federal law giving Section 330 grantees certain rights and considering further that
the CCHP contract is not the only one of its type (there are many other PHSPs, like CCHP),

plaintiff's representation as to the true "position" of the State is at best highly questionable. Ex. 2, Encls. 2, 3, 6-8.  On the same theme:

   a.    In 1993, CCHP applied to the New York State Department of Health ("DOH") for certification to operate as a prepaid health service plan. During the rigorous application process, CCHP provided DOH with copies of its formative documents, including a draft of the JVA. DOH specifically commented on the JVA's provision for the distribution of surplus funds and stated, in part, that: "t]he agreement should state that any distributions of surplus funds shall be made only after the PHSP has met its contingent reserve fund requirement and any other capital needs." Ex. 2, Encl. 2. Plaintiff specifically incorporated DOH's comments into the JVA and adopted the amended version at its first board meeting. Ex. 2, Encl. 3 (at p. 15) (JVA § V(D) stating that surplus distributions are subject to "any required capital or reserve funds or approvals by the New York State Department of Health").

   b.    While the complaint references plaintiff's § 501(c)(3) tax-exempt status, it fails to mention that, when plaintiff applied to the federal government for that status, it plainly disclosed its intent to make distributions to Mount Vernon. Ex. 2, Encl. 6 (at Tab B p. 10-12). In response to specific questions from the IRS, plaintiff described its intent to make the surplus distributions in detail. Ex. 2, Encl. 7 (at p. 22-23). "Based on the information supplied," the IRS approved plaintiff's application for § 501(c)(3) status. Ex. 2, Encl. 8. In doing so, the IRS implicitly found – contrary to plaintiff's claims and representations here – that the payments would *not* confer an improper private benefit on any individual or entity "in whole or in part" or serve a private rather than a public interest. IRS Code § 501(c)(3) (granting tax exemption only if "no part of the net earnings of [the organization] which inures to the benefit of any private shareholder or individual. . ."); *see also* Treas. Reg. § l.501(c)(3)-l(c)(2) (tax-exempt status not available to organiza-

tion if its net earnings inure to the benefit of private shareholders or individuals "in whole or in part").

Plaintiff's claims that the payments were unlawful and *ulta vires* and request for a declaration to that effect necessarily implicate the federal law and determination that the payments were entirely consistent with both plaintiff and Mount Vernon's shared charitable purpose – *i.e.*, to enhance the quality and availability of care to their patient pool. IRS Code § 501(c)(3). Plaintiff's claims necessarily call for a judicial determination that the IRS got it wrong when it found the surplus distributions to be permissible.

c.    The complaint neglects to mention that the federal government approved plaintiff's Medicaid managed care contract pursuant to § 1396b(m)(2)(G) and did so on the express condition that CCHP "must be primarily owned and controlled by health centers receiving grants under Section 329(d)(1)(A) or Section 330(d)(1) of the PHS Act and that primary medical services must be provided to enrollees through such centers…" Ex. 1. Section 1396b(m)(2)(G) speaks directly to the propriety of the payments at issue. This omission is fatal to plaintiff's remand motion and the merits of its claims.

The very federal statute under which plaintiff received its Medicaid managed care contract authorizes FQHCs, like Mount Vernon, to receive such contracts and, thus, capitation payments as well. CCHP was simply the "corporate vehicle" through which Mount Vernon received the contract and capitation. 53 Fed. Reg. 744-01, 1988 WL 274000. The JVA reflects precisely the sort of business arrangement that Congress and HHS contemplated and authorized. *Id.*; 42 U.S.C. § 1396b(m)(1)(C)(ii)(IV).

In addition to Medicaid managed care provisions, Congress further expressed its intent in § 1128(B)(b) of the Social Security Act (42 U.S.C. § 1320a-7b(b)) to protect the business ar-

rangement between plaintiff and Mount Vernon and authorize the payments to Mount Vernon. In

particular, this anti-kickback statute creates a "safe harbor" and thereby expressly permits the

payments made to Mount Vernon:

> any remuneration between a health center entity described under clause (i) or (ii)
> of section 1396d (l)(2)(B) of this title and any individual or entity providing
> goods, items, services, donations, loans, or a combination thereof, to such health
> center entity pursuant to a contract, lease, grant, loan, or other agreement, if such
> agreement contributes to the ability of the health center entity to maintain or in-
> crease the availability, or enhance the quality, of services provided to a medically
> underserved population served by the health center entity.

*Id*. at § 42 U.S.C. § 1320a-7b(b)(3)(H)

When Congress enacted § 1128(B)(b) it directed HHS to establish standards for this safe

harbor provision. In particular, Congress directed HHS to consider, among other factors,

"[w]hether the arrangement between the health center entity and the other party results in saving

of Federal grant funds or increased revenues to the health center entity." *Id*. (historical and statu-

tory notes). "[T]his factor evidences Congress's intent that a protected arrangement," like the one

at issue here, "directly benefit the health center economically and that the *benefits* of the ar-

rangement *primarily inure* to the health center, rather than the individual or entity providing the

remuneration." *See* Notice of Proposed Rulemaking, Office of the Inspector General, HHS, 70

Fed. Reg. 38081-01, at *38083, 2005 WL 1535094 (F.R.) (July 1, 2005) (emphasis added).

Given plaintiff's prior representations to government officials as to the propriety of the

distributions under federal law (which was critical to its eligibility to receive the Medicaid man-

aged care contract and 501(c)(3) status), it is astonishing that it now claims that an action seeking

a declaration as to the legality of those payments does not raise a substantial and disputed federal

issue.

There is simply no doubt that federal law wholly governs and sanctions the "protected arrangement" between plaintiff and Mount Vernon and that Congress intended for the "*benefits* of the arrangement *primarily inure* to the health center [Mount Vernon], rather than the individual or entity providing the remuneration [CCHP]." 70 Fed. Reg. 38081-01, at *38083.

3.      Plaintiff's complaint also neglected to mention the fact that CCHP's directors sought and received, and thereafter acted in good faith and reliance on, the advice of former CCHP counsel that the distributions were legally proper when they unanimously voted to authorize them. Ex. 2, Encl. 3 (pp. 1, 15); Encl. 6 (Tab B p. 10); Encl. 7 (pp. 22-24); Encl. 11 (p. 2); Encl. 12 (pp. 3-5). The advice was from Deborah Bachrach and other counsel at Kalkines, Arky, Zall & Bernstein ("Kalkines"),[6] a New York firm which specialized in health care law and represented CCHP throughout its formation and regulatory approval process. Kalkines prepared, among other things, plaintiff's JVA, By-Laws (both of which are referenced in the complaint),[7] Articles of Incorporation and applications for PHSP certification and tax-exempt status.

4.      The complaint alleges that Mount Vernon has taken the position that the payments were "proper in all respects," but mischaracterizes its position as having been based only on State law. Compl. 8-9 ¶¶ 23, 26, 32. The complaint fails to mention that Mount Vernon had repeatedly asserted that the business arrangement between the parties and related payments were entirely lawful and specifically authorized under federal law. *E.g.*, Ex. 2 (p. 12); *see also id*. at Tab 13. Mount Vernon made its federal law claims orally and in writing (and repeatedly offered

---

[6] Kalkines was later acquired by Manatt, Phelps & Phillips, LLP.
[7] Plaintiff asserts that the distributions violated its By-Laws, Compl. 9 ¶ 30 – the ones drafted by the very counsel who expressly advised plaintiff to the contrary. In about 2006, Ms. Bachrach accepted an appointment to serve as DOH's Deputy Commissioner and Medicaid Director. Indeed, she has functioned on the termination of plaintiff's operations in her official capacity but did so without any mention of the surplus distributions. Ex. 2, Encl. 9. It would have presented a glaring conflict had she or DOH actually taken the position that the distributions were unlawful. As far as we know neither she nor DOH ever did so. Ms. Bachrach resigned in December 2009, after a three year stint in office.

to elaborate upon them), *id.* at pp. 1, 13, and provided supporting documentation as well. Ex. 2. Plaintiff never responded to the federal issue. In essence, the complaint is premised on the notion that the payments were unlawful and *improper* in all respects and that Mount Vernon's contrary claims are *all* invalid. Indeed, plaintiff seeks a full declaration as to the parties' rights and the legality of the payments, not to mention damages. Plaintiff cannot obtain the relief it seeks without establishing, in its case-in-chief (as opposed to a defense), that the payments were unlawful in all respects and that Mount Vernon has no right to them under federal law. This is precisely the rare type of situation where federal law is a "necessary element" of the claim and "plaintiff's right to relief necessarily depends on the resolution of a substantial question of federal law," *Franchise Tax Bd.*, 463 U.S. at 13, 27-28. Plaintiff's seeking a full declaration of the parties' rights and damages cannot negate the existence of the situation by its failure to mention the laws under which Mount Vernon's rights arise. In other words, plaintiff cannot, in good faith, expect a court to fully declare the parties' rights and the legality (or illegality) of the payments without construing and applying the federal law on which their respective rights and the payments at issue are premised. This is especially so where, as here, plaintiff itself previously represented to federal and State government officials that the distributions were lawful under federal law.

5.      The New York State Attorney General's claims (at 2) that Mount Vernon never engaged in "constructive discussions on how to resolve this issue" is incorrect.  Mount Vernon retained the *pro hac* attorneys in this case who, at Mount Vernon's insistence, met with the Assistant Attorney General and asked her to explain her positions (because CCHP counsel represented that her positions under girded the question of whether the payments at issue were lawful). Ex. 2, Encl. 13. She explained the state's position under N-PCL § 515(a), but conceded that she had very little authority on § 515(a) and no authority on point to support her position. *See*

CCHP's January 14, 2009 board meeting minutes annexed hereto as Ex. 3. She asserted that the payments were improper on the theory that they "inured" to the benefit of plaintiff's directors in their capacity as officers of Mount Vernon and Sound Shore. *Id*. That theory directly contradicts the position plaintiff took in its application to the IRS for tax-exempt status. *E.g.*, Ex. 2, Encl. 7 p. 22-24. Indeed, if it were true that the distributions conferred an unlawful, improper and inequitable benefit on Mount Vernon, it is inconceivable that the efforts of the State's Medicaid officials to utilize CCHP-like entities in the Medicaid program would have been undertaken.  Nor would CCHP have been granted the requisite tax-exempt status to obtain the Medicaid managed care contract and capitation payments in the first place.

Mount Vernon also explained its position, prior to this litigation, to plaintiff's prior counsel, Board of Directors, and the Temporary Receiver. For example, Mount Vernon sent the Temporary Receiver a letter and documents outlining its position and requesting a meeting to elaborate, in particular, on the various federal issues. Ex. 2. Plaintiff never responded to the substance of Mount Vernon's claims and declined repeated requests for a meeting. Instead, plaintiff apparently used Mount Vernon's information to craft its complaint so as to conceal or obscure the controlling federal issues.

6.      The Assistant Attorney General mischaracterizes (at 2) Mount Vernon's position as saying that "any and all actions against it must be brought in federal court" because it receives Section 330 funding. Mount Vernon made no such claim. While plaintiff's claims happen to be removable for a variety of reasons, FQHCs like Mount Vernon are subject to state process where the action concerns activities within the scope of their Section 330 grant project for which they are authorized to spend their funds. FQHCs are restricted under federal law to using their grant and nongrant funds for purposes that benefit and further "the objectives of the [Section 330] pro-

ject." 42 U.S.C. § 254b(e)(5)(A) and (D). Not only would it undermine Mount Vernon's project to pay damages in this case for having engaged in a protected activity, but it would expose Mount Vernon to double damages because the federal government, which tightly regulates federal grantee programs and spending, would no doubt disallow the cost. *E.g., Neukirchen v. Wood County Head Start, Inc.*, 53 F.3d 809, 811-14 (7th Cir. 1995) (HHS directed grantee not to pay damages for age discrimination judgment and asserted that such cost is unallowable).

If, for example, an FQHC contracted with a physician by which it agreed to pay certain incentives, the FQHC would be subject to state judicial process for breach of contract if it failed to make payments as required by the contract. *See, e.g., Joseph Marino v. Three Lower Counties, Community Services, Inc.*, Case 1:09-cv-03027-JFM (D. Md. N. Div.) (State breach of contract action removed solely on basis of diversity jurisdiction). Similarly, if Mount Vernon had breached its duties to under the JVA, it would be subject to State process to enforce the terms of the agreement. Plaintiff, however, did not allege that Mount Vernon breached the JVA, nor could it plausibly do so.

The state also could have brought an action against the individual members of CCHP's Board of Directors alleging a breach of fiduciary duty, *People ex rel. Spitzer v. Grasso*, 11 N.Y.3d 64, 70-72, 893 N.E.2d 105 (Ct. App. 2008), but did not do so for obvious reasons (*i.e.*, the distributions were made in good faith and in reliance on the advice of counsel – who later became Deputy Commissioner of DOH – and thus the business judgment rule would apply). An action alleging a breach of fiduciary duty, even if the standard of care took into account federal law, would *not* necessarily depend on the resolution of a substantial federal question. Moreover, premiums for a Director & Officer Insurance policy are allowable costs. *Neukirchen*, 53 F.3d at 813 n.5.

18

7.     The Attorney General incorrectly suggests (at 2) that Sound Shore agrees with its position on the distributions because it returned the funds. In its agreement (Exhibit B) to do so, Sound Shore expressly denied having "violated any federal, state, or local law (statutory or common law), ordinance or regulation, committed any wrong whatsoever." Moreover, Sound Shore does not have the same rights as an FQHC. Unlike Mount Vernon, Sound Shore has no independent right to receive and carry out a Medicaid managed care contract. 42 U.S.C. § 1396b(m). The only reason Sound Shore was able to participate in the protected arrangement here is by piggybacking on Mount Vernon's right and eligibility to do so and by agreeing to permit Mount Vernon to control CCHP, a federal condition on that piggybacking. 42 U.S.C. §§ 1396b(m)(1)(C)(ii)(IV) and 1396b(m)(2)(G).

8.     The complaint alleges that "[n]one of CCHP's internal records describes the Surplus Distributions to Mount Vernon and Sound Shore as charitable grants or other permissible payments." That is false. Ex. 2, Encls. *passim*.[8] Mount Vernon largely attributes the complaint's omissions and misrepresentations to plaintiff's predecessor counsel, Epstein Becker & Green, P.C. ("EBG"), who filed the complaint despite having been conflicted and disqualified. *See* Mount Vernon's December 3, 2009 letter to the Court. Plaintiff, however, failed to correct its course after retaining substitute counsel.

## ARGUMENT

1.     Plaintiff's claims "arise under" the laws of the United States within the meaning of 28 U.S.C. §§ 1331 and 1441. The general rule is a case is deemed to "arise under" federal law

---

[8]  It is also false because the description of the payments as "distributions" masks their substance. Grants, after all, can be payments.   It is what those payments are used for that makes them charitable grants.   The payments made to Mount Vernon by virtue of controlling federal law (Section 330) and regulations went for the charitable purpose (under State and federal law) of supplementing Mount Vernon's provision of health services to a population that is poor and medically underserved. Who better to receive "distributions" from CCHP to carry out a charitable mission than Mount Vernon? *See also* prior and subsequent discussion herein.

if its "well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on the resolution of a substantial question of federal law." *Franchise Tax Bd*, 463 U.S. at 27-28. A complaint which does not plead a federal cause of action may nevertheless "arise under" federal law if its claims "implicate significant federal issues." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005) (citing *Smith v. Kansas City Title & Trust Co.*, 255 U. S. 180 (1921)); *Shulthis v. McDougal*, 225 U.S. 561, 569 (1912). While there is no "'single, precise, all-embracing' test for jurisdiction over federal issues embedded in state-law claims between non-diverse parties," the pertinent question is: does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities. *Grable*, 545 U.S. at 314.

    a.    Plaintiff's right to relief necessarily depends on the resolution of substantial and disputed questions of federal law. Each of plaintiff's state law claims turn on the lawfulness of the payments to Mount Vernon and its rights (or lack thereof) to have received and expended the funds, as it did. Since Mount Vernon's rights to the funds are derived from (and authorized by) federal law, federal law is necessarily a substantial element of plaintiff's own claims which seek a full declaration of the parties' rights. The fact that plaintiff neglected to cite the federal law that expressly contemplates and authorizes the arrangement between the parties and related payments is not controlling because "a plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint." *Franchise Tax Bd.*, 463 U.S. at 22.

    The first cause of action seeks a declaratory judgment "stating the parties' rights" with respect to the payments at issue. Compl. 8 ¶ 27. In particular, plaintiff asked the court to "declare (a) that the Surplus Distributions . . . were unlawful and (b) that Mount Vernon is indebted to

CCHP in the amount of $987,000 plus interest." Compl. 8 ¶ 28. This claim plainly seeks a full declaration of the parties' rights and obligations with respect to the funds and the recovery of them, not merely a determination that a specific state law was violated. To prevail on its claim, plaintiff must establish that the payments were indeed *unlawful*, that Mount Vernon had *no* right to them, and that Mount Vernon is obligated to return them. As explained above, this claim necessarily puts the interpretation and effect of federal law at issue in plaintiff's case-in-chief, not solely by way of defense. *Franchise Tax Bd.*, 463 U.S. at 13. Neither plaintiff nor Mount Vernon's rights can be fully declared by the reviewing court without interpreting and applying federal law. The federal questions raised herein are not only disputed and substantial, but they are outcome determinative.

One of plaintiff's theories, which simply adopts the Attorney General's position, is that the payments were improper under N-PCL § 515(a) because they "inured" to the benefit of its directors in their capacity as officers of Mount Vernon and Sound Shore. Compl. 5; Ex. 3. Plaintiff itself, however, took the exact opposite position – *i.e.*, that the distributions did not confer an improper private benefit on any individual or entity or serve a private rather than a public interest – in its application for § 501(c)(3) status. The IRS granted plaintiff's tax-exempt status premised on those representations. That status is a lynchpin. Without it CCHP could not have received a Medicaid managed care contract or the funds at issue. 26 U.S.C. § 501(c)(3) (granting tax exemption only if no part of earnings "inures to the benefit of any private shareholder or individual"); Treas. Reg. § l.501(c)(3)-l(c)(2); *PNC Bank, N.A. v. PPL Elec. Utilities Corp.*, 189 Fed. Appx. 101, 104 n.3 (3d Cir. 2006) (state-law declaratory judgment action filed by trustee gave rise to federal-question jurisdiction, allowing removal, since right to relief turned on construction or application of federal law, namely 26 U.S.C. § 501(c)(21)) (citing *Grable,* 545 U.S. 308);

*Bobo v. Christus Health*, 359 F.Supp.2d 552, 556 (E.D. Tex. 2005) (federal question jurisdiction exists over state-law claims that charitable, non-profit hospital charged excessive rates to uninsured patients because right to relief hinged on construction and application of 26 U.S.C. § 501(c)(3)); 70 Fed. Reg. 38081-01, at *38083(Congress intended this "protected arrangement" to "directly benefit" health center "economically" and for benefits to "inure to the health center, rather than the individual or entity providing the remuneration"); 42 U.S.C. § 1320a-7b(b)(3)(H).

Second, to prove its unjust enrichment claim, plaintiff must show not only that Mount Vernon was enriched, but that the circumstances as between the parties was such that the enrichment was "unjust" and the distributions were, as plaintiff alleges, not made "by reason of *any* legal or equitable obligation of CCHP to Mount Vernon." Compl. 9 ¶ 31 (emphasis added); *see also id*. at 9 ¶ 30 (asserting that "Surplus Distributions" were "*ultra vires*, unlawful and in violation of the NPCL, and contrary to CCHP's bylaws, and Mount Vernon was not entitled to receipt of same"). Under New York law, "[a] cause of action for unjust enrichment arises when one party possesses money or obtains a benefit that in equity and good conscience they should not have obtained or possessed because it rightfully belongs to another." *Menthe v. Wenzel*, 178 A.D.2d 705 (N.Y.S. 3d Dept 1991). Moreover, "[r]ecovery for unjust enrichment may only be had where it is justified by 'broad considerations of equity and justice.'" *Andersen ex rel. Andersen, Weinroth & Co., L.P. v. Weinroth*, 48 A.D.3d 121, 849 N.Y.S.2d 210 (1st Dept. 2007). This claim calls for a broad based determination as to whether Mount Vernon had any right whatsoever to receive and spend the funds.

Stated otherwise, it is plaintiff's burden to prove that Mount Vernon had *no* legal or equitable right to so receive and expend the funds. As explained above, the payment of the funds to Mount Vernon was (and had to be) authorized by federal law and Mount Vernon's rights and ob-

ligations are thus derived from federal law. To carry its burden, plaintiff must therefore prove that Mount Vernon had no right under federal law to receive and spend the funds. Because "plaintiff's right to relief necessarily depends on the resolution of a substantial question of federal law," this Court has federal question jurisdiction. *Franchise Tax Bd*, 463 U.S. at 27-28. It would be impossible for the reviewing court to determine whether it was unjust and improper for Mount Vernon to have received the funds without construing the federal law that authorized, among other things: the sole purpose of CCHP, the only activities its engaged in, its receipt of a Medicaid managed care contract, Mount Vernon's control over its operations, and the very payments at issue.

Likewise, to prevail on its claim of money had and received, plaintiff must prove, as it alleged, that the funds at issue "belonged to CCHP" not Mount Vernon and that Mount Vernon "inequitably benefited from the receipt of the money." *Id*. 9 ¶ 36. "The core elements for a claim of money had and received under New York law are (1) defendant received money belonging to plaintiff, (2) defendant benefitted from the receipt of the money, and (3) under principles of equity and good conscience defendant should not be allowed to retain the money." *Richardson Greenshields Sec., Inc. v. Lau*, 819 F.Supp. 1246, 1268 (S.D.N.Y. 1993) (citation omitted). The essence of this claim is the same as plaintiff's declaratory relief and unjust enrichment claims. To prevail, the reviewing court would have to conclude that Mount Vernon had no right to receive and spend the funds, which is impossible to do without considering and construing federal law because Mount Vernon's rights to do what it did are derived from federal law.

b.     This is not a case where federal funds are merely "lurking in the background." Plaintiff seeks not only a determination as to the lawfulness of the payments, but seeks to recover the very funds in which the federal government has a proprietary interest. "A proceeding against

property in which the United States has an interest is a suit against the United States." *United States v. Alabama*, 313 U.S. 274, 281-82 (1941). It is well settled that a property interest of the United States cannot be subjected to state judicial process without its consent. *Maricopa County v. Valley National Bank*, 318 U.S. 357, 362 (1943); *see also* U.S. Const., Art. III, § 2 (extending federal judicial power "to Controversies to which the United States shall be a Party"); *see also Downey v. State Farm Fire & Casualty Co.*, 266 F.3d 675, 680-681 (7th Cir. 2001) ("Sometimes the federal interest in a controversy is so dominant that federal law applies – activating federal-question jurisdiction under § 1331 – even if the national government is not a party"). Federal funds in the hands of a grantee remain the property of the federal government unless and until expended in accordance with the terms of the grant. Plaintiff did not contest this point or confront the authorities for it. *E.g.*, *Neukirchen*, 53 F.3d at 812-14; *In re Joliet-Will County Community Action Agency*, 847 F.2d 430 (7th Cir. 1988); *Palmiter v. Action, Inc.*, 733 F.2d 1244, 1247 (7th Cir. 1984); *Henry v. First Nat'l Bank of Clarksdale*, 595 F.2d 291, 308-09 (5th Cir.1979).

        c.      Plaintiff's effort to distinguish *County of St. Charles, Mo. v. Missouri Family Health Council*, 107 F.3d 682 (8th Cir. 1997), is unavailing. In that case, removal was deemed proper because the plaintiff sued in state court for a declaration that it was eligible to receive federal grant funds under 42 U.S.C. § 300. Here, plaintiff's state action seeks a declaration that a federal grantee was *in*eligible to receive federal funds that it, in fact, received pursuant to 42 U.S.C. §§ 1396b(m)(2)(G) and 254b.

        d.      Plaintiff contends that Mount Vernon is not a federal corporation within the meaning of 28 U.S.C. § 1349 because it has no "capital stock." Plaintiff dismisses the holding in *Murphy v. Colonial Federal Savings & Loan Ass'n*, 388 F.2d 609 (1967), as dicta and contends

that, to read § 1349 as *Murphy* does, "is in direct conflict with the Congressional policy behind the enactment of 28 U.S.C. §§ 1348 and 1349." *Cupo v. Community Nat. Bank & Trust Co. of New York*, 438 F.2d 108, 110 (2d Cir. 1971). The Second Circuit, however, "reject[ed] this contention," while favorably citing *Murphy*. *Cupo*, 438 F.2d at 110. *Murphy* does not reduce the degree to which the United States must own a corporation in order to trigger § 1349. *Id.* Instead, it simply recognizes the modern day reality that corporate ownership is not always measured in "capital stock," as some corporations have none. *Id.*

       e.      Plaintiff asserts that the state claims are not completely preempted, but concedes that "federal issues" might "arise" if a state court were to conclude that the funds were recoverable. This claim is incorrect and internally inconsistent. The doctrines of complete preemption and/or sovereign immunity prevent the funds from being subject to state proceedings. In all situations, Mount Vernon holds its grant funds, and any property acquired with them, in trust for the federal government. Mount Vernon is bound to safeguard such assets against loss or theft, and may dispose of property in which the federal government has an interest only if the government so authorizes. *See* 45 C.F.R. § 74.37; *see also Neukirchen*, 53 F.3d at 812-14; *In re Joliet-Will*, 847 F.2d 430; *Palmiter*, 733 F.2d at 1247 (action removed by federal government as non-party).

       2.      The action is also removable under 28 U.S.C. § 1442. Plaintiff asserts that Mount Vernon is not a person within the meaning of § 1442 who acted under color of federal office, and that it failed to raise a colorable federal defense. *See Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 135-36 (2d Cir. 2008) (unlike §1441, §1442 is to be liberally construed); *Colorado v. Symes*, 286 U.S. 510, 517 (1932) (same). To the contrary, Mount Vernon is a "person" and an "agency" within the meaning of 28 U.S.C. § 1442. *See* 28 U.S.C. § 451 (defining "agency"); 18 U.S.C. § 6

(Revisers' Notes) ("corporation" includes governmental corporations which issue no stock). As a not-for-profit corporation, tax-exempt organization, FQHC under the Medicaid statute, and Section 330 PHS Act grant recipient, Mount Vernon is funded and controlled by the federal government. 42 U.S.C. §§ 254a, 254b, 1396a, 1396b(m); 42 C.F.R. §§ 51c.101-51c.507. Its use of those funds is tightly regulated and it is duty bound to safeguard them against loss or theft, and the government has a reversionary interest in its funds and property. *See* 45 C.F.R. §§ 74.24[9] and 74.37; *In re Joliet-Will*, 847 F.2d 430; 42 U.S.C. § 254b(e)(5)(A) & (D); *see also id*. at § 254b(b)(3)(A) (health centers perform essential public service). Mount Vernon acted as a contractor and agent of the federal government pursuant to a Medicaid managed care contract approved by the Regional Administrator of HHS. *In re Joliet-Will*, 847 F.2d 430, 432 ("nature of the grantor-grantee relationship is such as to constitute the grantee in effect an agent to carry out specified tasks"). Mount Vernon is even deemed "to be an employee of the Public Health Service," and afforded sovereign immunity for purposes of the Federal Tort Claims Act, 28 U.S.C. § 1346 *et seq*.). 42 U.S.C. § 233(g). In addition to the ample authority cited herein for the proposition that Mount Vernon has a federal defense, even the State of New York concedes that state regulation of Medicaid managed care "contracts is pre-empted." N.Y. General Counsel Opinion 4-24-2002 (#3).

Removal is also proper under 28 U.S.C. § 1442(a)(2). Section 1442(a)(2) permits removal if two conditions are met: (1) the property in controversy must derive from an officer of the United States; and (2) the controversy regarding the property must affect the validity of any law of the United States. *Benitez-Bithorn v. Rossello-Gonzalez*, 200 F.Supp.2d 26, 31 (D.P.R.

---

[9] Under § 74.24, "program income" generally is controlled by the same requirements as those that control grant funds. Section 74.2 defines such income as that "generated by a [grant] supported activity or earned as a result of the award." Mount Vernon's Section 330 grant underwrites all of its activities and created its eligibility to be a managed care contractor. The funds at issue are unarguably "program income."

2002); *Faulk v. Owens-Corning Fiberglass Corp.*, 48 F.Supp.2d 653, 669 (E.D.Tex.1999). Both conditions are met here because this action concerns title to property that was transferred from the United States pursuant to a statute enacted by Congress specifically for that purpose. 42 U.S.C. § 1396b(m)(2)(G). The funds here were derived from the CMS Regional Administrator, when he approved the Medicaid managed care contract pursuant to § 1396b(m)(2)(G). Ex. 1.

       3.     *Wong v. Community Health Center La Clinica*, 2007 WL 1246231 (E.D. Wash. 2007), which plaintiff cites as "powerful and persuasive precedent," expressly limited its unpublished ruling to "*the case at hand.*" *Id.* at *3 (emphasis in original). In any event, *Wong* is easily distinguishable. Wong's state action alleged that La Clinica's board members breached their fiduciary duties by engaging in "fraudulent, oppressive, and illegal acts," and asked for dissolution proceedings to be initiated. *Wong* states that "the federal funds" La Clinica receives "are 'lurking in the background' and are not a part of the central issue of whether La Clinica's directors and various members engaged in fraudulent, oppressive, or illegal activities." *Wong*, 2007 WL 1246231, *3. In other words, the resolution of Wong's claims did not necessarily turn on a substantial or disputed federal question.

       In stark contrast, the federal issues here are pervasive and *disputed*, not to mention dispositive. Plaintiff's claims concern the lawfulness of payments made pursuant to a "protected" Medicaid managed care arrangement that is specifically designed to benefit federally-funded health centers and enhance the availability and quality of their services to Medicaid beneficiaries. 70 Fed. Reg. 38081-01, at *38083. Not only does plaintiff seek the recovery of federal funds, but it seeks a full declaration of the parties' rights with respect to them. Despite plaintiff's prior inconsistent representations, the position it is taking in this litigation, and what it must prove as an element of its case to prevail, is that the distributions were "[im]proper in all respects," "unlaw-

ful," "ultra vires," "unjust," "inequitable," and "not made to Mount Vernon by reason of any legal or equitable obligation of CCHP" and that Mount Vernon was not entitled to receive the funds. Compl. 8-10. Among the problems with plaintiff's claim is the inescapable reality that the payments were lawful under federal tax law, 26 U.S.C. § 501(c)(3), the Medicaid program, 42 U.S.C. § 1396 *et seq*. (and related Title 42 provisions and federal regulations), and the PHS Act. In short, unlike *Wong*, this case is all about the federal funds.

## CONCLUSION

For the foregoing reasons, and those previously advanced in this case (*i.e.*, Mount Vernon's notice of removal and response to plaintiff's pre-motion letter), the Court should deny the motion to remand.

Dated: New York, New York
        January 28, 2010

Respectfully submitted,


/s/
James L. Feldesman, Esq.
Matthew S. Freedus, Esq.
Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W., 2d Floor
Washington, DC 20036
Tel.:   (202) 466-8960
Fax:    (202) 293-8103
Email: jfeldesman@feldesmantucker.com
Email:  mfreedus@feldesmantucker.com

/s/
David A. Koenigsberg
MENZ BONNER & KOMAR LLP
444 Madison Avenue, 39th Floor
New York, New York  10017-7115
Tel.:   (212) 223-2100
Fax:    (212) 223-2185
Email:  dkoenigsberg@mbklawyers.com

*Attorneys for Defendant*

28